NOT FOR PUBLICATION                                                    [20, 24]_____

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
DAVID BRENNAN,                          :
                                        :     Civil Action No. 04-3241 (FLW)
                Plaintiff,              :
                                        :
        v.                              :     **OPINION**
                                        :
CEPHALON, INC., ET AL,                  :
                                        :
                Defendants.             :
_____:

**APPEARANCES:**

For Plaintiff:
MARIO A. IAVICOLI, ESQ.
43 KINGS HIGHWAY WEST
HADDONFIELD, NJ 08033

For Defendants:
MICHAEL L. BANKS, ESQ. AND MICHAEL J. EAGLES, ESQ.
MORGAN, LEWIS & BOCKIUS LLP
1701 MARKET STREET
PHILADELPHIA, PA 19103

**WOLFSON, District Judge**:

        This matter has come before the Court upon Defendants' motion to dismiss all of

Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6) and Plaintiff's motion for leave to file an

amended complaint.  Plaintiff David Brennan ("Plaintiff" or "Brennan") has sued Defendants

Cephalon, Inc. ("Cephalon"), Frank Baldino, Richard Kaplan, Tim Sheehan, Armando Cortez

and John Does in connection with his employment with Cephalon and his subsequent discharge

therefrom.  Plaintiff alleges, inter alia, that he was wrongfully discharged by Defendants and that

he is entitled to severance pay pursuant to an oral contract or a plan pursuant to the Employee

Retirement Income Security Act of 1974 ("ERISA").  The issues before the Court are whether: 1) The Court should deny Plaintiff's motion to amend his complaint because the amendments are futile; 2) Plaintiff's allegations, coupled with the criminal statutes he has identified, state a claim for wrongful discharge pursuant to Pennsylvania's "commit a crime" exception to at-will employment; 3) Plaintiff has stated a claim for "free speech" wrongful discharge; 4) Plaintiff has stated a claim for breach of an oral contract; 5) Plaintiff has stated a claim for benefits pursuant to an ERISA plan; 6) Plaintiff has stated any claims against the Individual Defendants.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332.   For the reasons set forth below, Plaintiff's motion for leave to amend his complaint is granted in part and denied in part, and Defendants' motion to dismiss is granted in part and denied in part.

## I.    PROCEDURAL HISTORY

On June 3, 2004, Plaintiff filed suit against Defendants in the Superior Court of New Jersey, Law Division, Camden County.  Plaintiff filed an amended five count complaint on June 15, 2004, asserting claims for breach of contract, wrongful discharge, violation of the New Jersey Conscientious Employee Act, N.J.S.A. 34:19 ("CEPA"), prima facie tort, violation of the First and Fourteenth Amendments of the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1985(2).  Defendants filed a notice of removal on July 8, 2004, and on July 15, 2004, they filed a motion to dismiss all claims.  Oral argument regarding Defendants' motion was held on January 26, 2005.  At oral argument, Plaintiff admitted that he was proceeding under Pennsylvania law; thus there was no claim under CEPA, a New Jersey statute.  The Court also directed the parties to submit additional briefs on the intracorporate conspiracy doctrine in connection with the Civil Rights Act claim in Count V of the Amended Complaint.  On March 2,

2005, the Court issued an Order granting Defendants' motion in part, and denying it in part, with leave given to Plaintiff to file another Amended Complaint.  The Court ordered that: Plaintiff's wrongful discharge claim be dismissed without prejudice; Plaintiff's claim under CEPA be dismissed with prejudice; Plaintiff's state law breach of contract claim for severance benefits be dismissed without prejudice; and Plaintiff's prima facie tort claim be dismissed with prejudice.  Moreover, in that Order, it was clarified that in Count V of the Amended Complaint, Plaintiff was proceeding under the Civil Rights Act, 42 U.S.C. § 1985(2), only.  In an Opinion dated March 24, 2005, the Court dismissed Plaintiff's Civil Rights Act claims against all Defendants, and dismissed Plaintiff's claims against Defendant Baldino without prejudice.  On April 7, 2005, Plaintiff filed his Second Amended Complaint.  In the Second Amended Complaint, Plaintiff brought claims against Defendants for wrongful discharge and either breach of contract, or in the alternative, for benefits pursuant to an ERISA plan.  Defendants filed the instant motion to dismiss Plaintiff's Second Amended Complaint on April 27, 2005.  On July 11, 2005, Plaintiff filed the instant motion for leave to file a Third Amended Complaint.  In the proposed Third Amended Complaint, Plaintiff has brought the same contract/ERISA claim, amended the wrongful discharge claim by adding ten new paragraphs, and he has added an additional count, for wrongful discharge in violation of constitutional "free speech rights." Oral argument on both motions was held on August 18, 2005.

## II.   MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT

Federal Rule of Civil Procedure 15(a) gives a court discretion to allow amendment of a pleading once as a matter of course, and provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). After the first amendment of a pleading, a party may

only amend thereafter "by leave of court or by written consent of the adverse party...." Id.

Interpreting Rule 15(a), the Supreme Court stated:

> [T]his mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be 'freely given.' Foman v. Davis, 371 U.S. 178, 182 (1962).

In Heyl & Patterson International, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc., 663 F.2d 419, 425 (3d Cir. 1981), cert. den. sub nom. F.D. Rich Housing of the Virgin Islands, Inc. v. Gov't of the Virgin Islands, 455 U.S. 1018 (1982), the Third Circuit stated that undue prejudice is the "touchstone" for denial of leave to amend. Undue prejudice occurs when the non-moving party is "unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the [moving party] been timely." Id. at 426 (citations omitted). Incidental prejudice is not a sufficient reason to deny leave to amend; rather, any resulting prejudice must be truly "undue." Id.

Absent a showing of undue prejudice to the non-moving party, "denial must be grounded in [the moving party's] bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure a deficiency by amendments previously allowed or futility of amendment." Heyl, at 425; see also Hewlett-Packard Co. v. Arch Assoc. Corp., 172 F.R.D. 151, 153 (E.D. Pa.1997).

Here, Defendants argue that Plaintiff's motion should be denied because the amendments are futile.  In assessing the "futility" of an amendment, the Court "applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." MedPointe Healthcare Inc. v. Hi-Tech Pharmacal Co., 380 F.Supp.2d 457, 462 (D.N.J. 2005) (quoting In re Burlington Coat Factory

4

Sec. Litig., 114 F.3d 1410, 1434 (3d Cir.1997)).  Therefore, the allegations and claims asserted in

Plaintiff's Third Amendment will be analyzed according to the "failure to state a claim" standard.

If a particular claim as alleged in the Third Amended Complaint can withstand a motion to

dismiss, Plaintiff's motion for leave for file an amended complaint will be granted as to that

claim.  If, on the other hand, a claim as alleged in the Third Amended Complaint cannot

withstand a motion to dismiss, Plaintiff's motion for leave for file an amended complaint will be

denied on futility grounds.

## III.  FACTS ALLEGED IN PLAINTIFF'S THIRD AMENDED COMPLAINT[1]

Cephalon is a biotechnology company that manufactures, sells, and distributes certain

drugs, including Actiq.[2]  On March 4, 2002, Cephalon hired Plaintiff as Compliance Auditor.

Third Am. Compl., Count I, ¶ 8.  As Compliance Auditor, Plaintiff conducted compliance audits

to determine whether Cephalon was complying with Food and Drug Administration ("FDA")

rules, regulations and conditions. Id. ¶ 29.   In early 2003, Richard Kaplan ("Kaplan"),

Cephalon's Vice President of Quality, directed Plaintiff to conduct an audit of Actiq's Risk

Management Program ("RMP") in the second quarter of 2003.  Id. ¶¶ 30-31.  In his audit report,

Plaintiff concluded that, for a number of reasons, Cephalon was not in compliance with the

FDA's approval of Actiq. Id. ¶ 36.  Plaintiff alleges in his complaint that he made the following

---

[1]Since this is a Rule 12(b)(6) motion to dismiss, the Court will accept as true Plaintiff's allegations as pleaded in the Third Amended Complaint.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

[2]According to Plaintiff, "Actiq is a potent opiod narcotic painkiller drug in flavored lollipop form designed to provide relief from pain to cancer patients" that is being "abused." Third Am. Compl. ¶¶ 14-18.

findings in his audit report:

A) Cephalon was required by the FDA as a condition of approval, that Cephalon conduct customer surveys of four (4) pharmacy companies that sold Actiq. Cephalon surveyed only one pharmacy company, and, therefore, was not in compliance with FDA approval.

B) Cephalon is required by the FDA to ascertain if new patients are receiving the Welcome Kits. The limited survey disclosed that a large percentage of new patients were not receiving the Welcome Kits.

C) Cephalon is required to take action if new patients are not receiving the Welcome Kits.  Cephalon was not taking any action to correct the deficiency; and, therefore, Cephalon was not in compliance.

D) Cephalon was required by the FDA to do Point of Dispensing monitoring. No Point of Dispensing monitoring was conducted apart from one pharmacy company's direct patient call back surveys; and, therefore, Cephalon was not in compliance.

E) The one pharmacy company that was surveyed disclosed that the Point of Dispensing requirement was not met. Cephalon took no action to correct this deficiency; and, therefore, is not in compliance.

F) Actiq is approved for a very narrow therapeutic category of patients. Cephalon is obligated to assure that Actiq is not marketed outside the approved specific category of patients. Physician specialities are described as representing appropriate patient selection or inappropriate patient selection. If the ratio of prescriptions by specialities representing  inappropriate patient selection exceeds 15% of the total prescriptions written, the company is required to report such to the FDA and further requ for the offending specialties.

G) In one section of the Quarterly Reports to the FDA, Cephalon simply states that no individual speciality exceeds 15%. This 15% reporting applies to specialties designated to represent appropriate patient selection as well as a dozen or more specialties representing inappropriate patient selection.

H)In the section of Quarterly Report to the FDA corresponding to specialties representing appropriate vs. inappropriate patient selection  requirement, nothing is reported. This section is routinely omitted from the report.

I) Prescribing data is not analyzed by appropriate and inappropriate patient selection so the ratio has not been determined or reported.

J) No physician training programs for offending specialities have been conducted.

K) Not only has Cephalon not taken any action to reduce the ratio of prescriptions written by specialties representing inappropriate patient selection but Cephalon's goal is to grow the use of Actiq at an extraordinary rate.

Id.

In October 2003, Plaintiff submitted a draft copy of his audit report to Tim Sheehan ("Sheehan"), Cephalon's Director of Quality Assurance.  Id. ¶ 34.  Sheehan instructed Plaintiff not to publish the report until Sheehan discussed the report with Kaplan.  Id. ¶ 39.  For six weeks, and notwithstanding Plaintiff's requests to distribute the report, Kaplan instructed him not to distribute the report.  Id. ¶ 40.

On November 10, 2003, Plaintiff  "had decided that he was going to disclose his findings, conclusions, and RMP report to the authorities," and discussed this decision with Lisa Carle ("Carle").  Id. ¶¶ 42-43.  Carle advised Plaintiff not to publish the report until Armando Cortez ("Cortez"), Cephalon's newly hired Director of Quality Assurance, had a chance to review the report.  Id. ¶ 43.  On November 13, 2003, Cortez held a meeting to discuss Plaintiff's report.  Id. ¶ 48.  The meeting was attended by Cortez, Sheehan, Kaplan and Plaintiff.  Id.  At the meeting, Kaplan instructed Plaintiff to mark the copies of the report "Confidential-Do Not Copy," and to collect the copies at the end of the meeting.  Id.  Plaintiff was also instructed who was to review the report, and how it was to be reviewed.  Id.

A meeting to review the report took place on December 1, 2003.  Id. ¶¶ 50-55.  At this meeting, Tracie Parker ("Parker"), upon learning about the contents of the report, stated that Plaintiff was not permitted to recite in the RMP report that Plaintiff was not in compliance and insisted that her name be removed from the report and that her superior attend the meeting.  Id. ¶ 53.  It is through this meeting with Parker that Plaintiff alleges that "Cephalon sought to compel, order and intimidate plaintiff to change his audit report from an accurate audit report

of 'noncompliance' to a false audit report of 'compliance.'"  Id. ¶ 54.  In response, "[P]laintiff refused to change his audit report from an accurate audit report of 'noncompliance' to a false audit report of 'compliance.'"   Id. ¶ 55.   Parker left the meeting and returned shortly thereafter, with Kaplan.  Id. ¶¶ 53-56.  Kaplan asked some questions, and then he and Parker both left the meeting.  Id. ¶ 56.

On December 1, 2003, after the meeting, Plaintiff revised the RMP report based on comments made at the meeting and subsequently distributed the finalized report.  Id. ¶¶ 58-59. Various Cephalon employees received copies of the report; the original report was placed in the Quality Assurance ("QA") Audit Central Files.  Id. ¶ 60.  Carol Marchione ("Marchione"), whose group was responsible for assembling and reporting RMP data to the FDA,  was supposed to respond to Plaintiff's report, first by the end of December 2003, and then by the end of January 2004.  Id. ¶¶ 61-65.

During the week of February 2, 2004, "almost the entire" QA Department attended the QA Summit in Utah.  Id. ¶ 66.   However, Plaintiff "was excluded from the Summit." Id. Beginning on February 9, 2004, and until his termination on February 12, 2004, Plaintiff repeatedly asked Sheehan if he could send a note to Marchione regarding the response to his report, which she had yet to issue.  Id. ¶¶ 67-69.  Sheehan repeatedly instructed Plaintiff not to send such a note to Marchione.  Id.  At a meeting on February 12, 2004, Cephalon terminated Plaintiff's employment.  Id. ¶¶ 72-74.  After the meeting, Cortez escorted Plaintiff back to Plaintiff's office to collect his personal effects, and then escorted Plaintiff to the front door and directed him to leave the Cephalon facility.  Id. ¶ 74.  Upon terminating Plaintiff, Cephalon offered him a severance package, which was subject to certain conditions.  Id. ¶ 75.  Plaintiff did

not accept the severance package.  Id. ¶ 76.

Plaintiff alleges that, pursuant to "18 U.S.C.A. §1001, 18 U.S.C.A. §371, and Pa CSA §4911," he and Defendants "were legally obligated to report to the FDA the findings and conclusions, etc. of plaintiff's audit report indicating that Cephalon was not in compliance with the FDA approvals regarding the sale of the drug Actiq by Cephalon." Id. ¶ 62, 82.  Plaintiff also alleges that he was terminated as a result of: 1) his "insistence that [his] findings, conclusions, etc., of his audit report of noncompliance be reported to the FDA," id. ¶ 87; 2) his "insistence that if Cephalon did not disclose ... the plaintiff's findings and conclusions of his noncompliance audit report [to the FDA] that plaintiff would make such a disclosure to the FDA," id. ¶ 88; 3) his "refusal ... to falsify his audit report", id. ¶ 89; and 4) the fact that he "perform[ed] his duties and responsibilities legally and did in fact produce an accurate audit report with findings and conclusions that Cephalon was not in compliance with FDA approvals for the sale of the drug Actiq, instead of producing a false compliance audit report for the sale of that drug," id. ¶ 90.  Plaintiff also alleges that he "believes that the Risk Management [Program] contains provisions that legally obligate plaintiff to disclose his findings, conclusions, and report regarding the noncompliance in question to the FDA." Id. ¶ 77.[3]

_____

[3]According to his complaint, "Plaintiff does not have a copy of the RMP and the audit report in question; and therefore, must obtain same in discovery."  Third Am. Compl. ¶ 81.  On August 17, 2005, pursuant to the Court's request, Defendants provided a copy of the Risk Management Program ("RMP") to the Court and to Plaintiff.  On a motion to dismiss, the Court generally does not consider documents extraneous to the pleadings, but the Court may consider a "document integral or explicitly relied upon in the complaint ... without converting the motion to dismiss into one for summary judgment." In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, because Plaintiff refers to the RMP throughout his complaint, this Court may consider the RMP without converting this Rule 12(b)(6) motion into a motion for summary judgment.  See id.

## IV.  DEFENDANTS' MOTION TO DISMISS

### A.  Motion to Dismiss Standard

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  A claim should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002).  The inquiry is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  In deciding a 12(b)(6) motion, courts must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Id.  Nevertheless, courts are not required to credit bald assertions or legal conclusions alleged in the complaint.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).  Similarly, legal conclusions draped in the guise of factual allegations do not benefit from the presumption of truthfulness.  In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

### B.  Plaintiff's Wrongful Discharge Claim

In general, Pennsylvania does not recognize a common-law cause of action for the termination of at-will employment.  See, e.g., Paul v. Lankenau Hosp., 524 Pa. 90, 569 A.2d 346, 348 (1990); Geary v. United States Steel Corp., 456 Pa. 171, 319 A.2d 174 (1974). An at-will employee may be fired for good reason, bad reason, or no reason at all.  Krajsa v. Keypunch, Inc., 424 Pa.Super. 230, 622 A.2d 355, 358 (1993). "Exceptions to this rule have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten

10

clear mandates of public policy." Clay v. Advanced Computer Applications, Inc., 522 Pa. 86, 559 A.2d 917, 918 (1989). Pennsylvania first recognized this public-policy exception to at-will employment in Geary.

In order to make out a case under the exception, Brennan must point to a clear public policy articulated in the constitution, legislation, an administrative regulation, or a judicial decision. Hunger v. Grant Cent. Sanitation, 670 A.2d 173, 175 (Pa. Super. 1996). The stated mandate of public policy must be directly applicable to the employee and her actions. Id. at 175-76 ("It is not sufficient that the employer's actions toward the employee are unfair."). The public-policy exception is generally broken down into three categories: an employer (1) cannot require an employee to commit a crime, (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute. Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. 1998).

The third public policy exception is clearly not applicable here, because there is no statute that prohibits Cephalon's termination of Brennan.  Plaintiff argues that the first and second public exceptions are applicable here, and identifies four statutes in support of his argument: 18 U.S.C. § 1001, 18 U.S.C. § 371, 18 Pa Cons. Stat. Ann 4911, and 21 U.S.C. § 333.[4]  18 U.S.C. § 1001, 18 U.S.C. § 371, 18 Pa Cons. Stat. Ann 4911 are generic criminal statutes and 21 U.S.C. § 333 is an FDA criminal statute.  Plaintiff has relied upon these statutes to implicate both the "commit a crime" and "statutorily imposed duty" exceptions; however, these statutes are not the

---

[4]Plaintiff identifies 18 U.S.C. § 1001, 18 U.S.C. § 371 and 18 Pa Cons. Stat. Ann 4911 in both his briefs and his Third Amended Complaint. He identifies 21 U.S.C. § 333 in his briefs, only.

type that can support the applicability of the "statutorily imposed duty" exception.

While Plaintiff references Cephalon's FDA requirements and duties in his complaint and papers, nowhere does Plaintiff identify a specific statute imposing these duties upon himself, or even upon Cephalon.  The statutes that Plaintiff has identified do not implicate the "statutorily imposed duty" public policy exception to at will employment because they do not impose specifically delineated statutory affirmative duties upon Plaintiff, nor do they advance the "one-step removed" argument--that Cephalon had statutory duties and those duties were imputed to Plaintiff by virtue of his job and duties as compliance auditor.

In contrast, the plaintiff in <u>Field</u> (an employee at a nuclear power plant) was by law specifically required to notify the Nuclear Regulatory Commission ("NRC") of any failure to follow NRC regulations and was subject to a fine if he failed to do so. The statute also specifically prohibited an employer from discharging an employee for reporting a violation. Similarly, in <u>Reuther v. Fowler & Williams, Inc.</u>, 255 Pa. Super. 28, 386 A.2d 119 (1978), the plaintiff was fired for performing jury duty, which the law specifically required him to do. Brennan's case is readily distinguishable from <u>Field</u> and <u>Reuther</u>, where the plaintiffs were fired because they carried out specifically delineated affirmative duties imposed by statute.

The statutes that Plaintiff has identified--18 U.S.C. § 1001, 18 U.S.C. § 371, 18 Pa Cons. Stat. Ann 4911, and 21 U.S.C. § 333--are criminal statutes that advance his argument that he would have been criminally liable had he falsified his reports, and as such, implicate the "commit a crime" exception.   The False Statements Act ("FSA"), Section 1001 of Title 18 of the United States Code, makes it a crime to knowingly and willfully make a false statement to the United

States or to any department or agency thereof. 18 U.S.C. § 371 prohibits conspiracies "to commit

any offense against the United States, or to defraud the United States, or any agency thereof.." 18

U.S.C. § 371.   A person violates 18 Pa.C.S.A. § 4911 if he or she:

> (1) knowingly makes a false entry in, or false alteration of, any record, document
> or thing belonging to, or received or kept by, the government for information or
> record, or required by law to be kept by others for information of the government;
> (2) makes, presents or uses any record, document or thing knowing it to be false,
> and with intent that it be taken as a genuine part of information or records referred
> to in paragraph (1) of this subsection; or (3) intentionally and unlawfully destroys,
> conceals, removes or otherwise impairs the verity or availability of any such
> record, document or thing.  18 Pa.C.S.A. § 4911.

21 U.S.C. § 333 is a lengthy statute that proscribes criminal penalties for violations of other FDA

statutes, none of which have been cited by Plaintiff or are applicable here.

Pennsylvania must have intended the "statutorily imposed duty" exception and  "commit

a crime" exception to be distinct from one another.  If Plaintiff were correct that the generic

criminal statutes he identifies also implicate the "statutorily imposed duty" exception, there

would be no reason for Pennsylvania to have the "commit a crime" exception because that

exception's teeth would be completely swallowed by the "statutorily imposed duty" exception

and the exceptions would overlap in such a way as to render the  "commit a crime" exception

meaningless.  Therefore, the Court interprets Plaintiff's claim to be under Pennsylvania's

"commit a crime" exception to at-will employment, only.  Thus, the issue for this Court is

whether Plaintiff's allegations, coupled with the criminal statutes he has identified, state a claim

for wrongful discharge pursuant to the "commit a crime" exception.

Additionally, Plaintiff alleges that Defendants instructed him to violate § 1001 by

falsifying a report that is within the jurisdiction of the FDA, which states a wrongful discharge

claim pursuant to the "commit a crime" exception.  Defendants argue, however, that even if

Plaintiff changed his report pursuant to Cephalon's direction, he would not have faced criminal

liability under § 1001.

To convict a defendant under § 1001, the government must prove five elements: (i) the

defendant made a statement or concealment; (ii) the statement was false; (iii) the statement or

concealment was material (because it actually influenced or has a natural tendency or capacity to

influence a decision or function of a federal agency); (iv) the statement or concealment was made

"knowingly and willfully"; and (v) the statement or concealment falls within executive,

legislative, or judicial branch jurisdiction.   Brogan v. United States, 522 U.S. 398, 400 (1998)

(outlining elements of offense under § 1001).

"Section 1001 proscribes two different types of conduct: concealment of material facts

and false representations."  U.S. v. Curran, 20 F.3d 560, 566 (3d Cir. 1994).  In order to convict

under a section 1001 concealment charge, the government must show evidence of willful

nondisclosure by means of a 'trick, scheme, or device' and establish that the defendant had a

legal duty to disclose the facts at the time he was alleged to have concealed them. Id.  Defendants

have relied heavily upon this "duty to disclose" requirement and argue that Plaintiff would not

have faced criminal liability under § 1001 had he changed his report because he personally did

not have a duty to disclose his findings to the FDA.  However, by operation of 18 U.S.C. § 2(b),

which provides that a person who "willfully causes an act to be done which if directly performed

by him or another would be an offense against the United States, is punishable as a principal,"

Brennan's willful intent to cause a concealment, combined with a duty to report to the FDA on

14

the part of Cephalon, would constitute the elements of actionable concealment under Section 1001. See U.S. v. Richeson, 825 F.2d 17, 20 (4th Cir. 1987).  Therefore, while Plaintiff lacked the legal capacity to commit the crime of concealment by himself, he could have faced liability as a principal under Section 2(b) for willfully causing the concealment if Cephalon possessed a duty to report to the FDA that which would have been concealed and if the other elements of § 1001 were met. Moreover, Defendants' argument that under Curran, § 1001 liability requires a "duty to disclose," ignores the existence of § 1001 false representation liability, which does not require a duty to disclose.  To convict under a section 1001 false representations charge, the government must prove, inter alia, the actual falsity of the representations, id., which for the purposes of this motion, is satisfied by Plaintiff's allegations.

Whether Plaintiff's allegations fall under the umbrella of concealment or false representation, the issues for the Court to decide are the same. That is, accepting all well-pleaded factual allegations in the complaint as true and drawing all reasonable inferences in favor of Plaintiff, while not crediting "bald assertions" and "legal conclusions," the Court must determine whether Plaintiff has alleged that he would have been liable under § 1001 if he had altered his audit report pursuant to Cephalon's direction.  Three elements of § 1001--that the defendant made a statement or concealment, the statement was false, and the statement or concealment was made "knowingly and willfully"--are not at issue because they are satisfied by Plaintiff's allegation that Cephalon directed him to falsify his audit report.  The issues before the Court are: 1) whether a false statement or concealment would have fallen within the jurisdiction of the FDA, and 2) whether a falsity or concealment would have been material because it had a natural tendency or capacity to influence a decision or function of the FDA.

15

Defendants explain that the RMP was adopted in connection with Cephalon's predecessor's attempt to get the marketing of Actiq approved by the FDA and thus, they argue that Plaintiff's report was purely internal and was not required to be submitted to the FDA. Second Oral Arg. Transcr. at 28:12-20, 29:5-8, 37:4-5.   Specifically, at oral argument, Defendants made the following arguments:

- "Mr. Brennan has said that he believed Cephalon to be noncompliant. [We] should note that the report that Mr. Brennan prepared and the one that was submitted to  Ms. Marchione said that they were noncompliant with the RMPs in some respects.  So this allegation that Ms. Parker, who was not Mr. Brennan's superior, and not in the chain of command above him, somehow instructed him to change something is nonsensical."
  Id. at 36:10-18.

- "There is no indication that any report that Cephalon was to submit to the government had to repeat  this conclusion in it as to whether they were compliant or noncompliant. They were supposed to report some things under an agreement they had with the FDA for a risk management program.  None of that has criminal implications for Mr. Brennan."
  Id. at 37:6-13.

- "[T]he issue of whether Cephalon was compliant or noncompliant with its RMP is a question of judgment.  There were some issues where Mr. Brennan thought they were compliant and where his superiors disagreed with him.  We are talking about that ultimate judgment and conclusion that he says he  made.  We are not, as a court, permitted here, [we]  respectfully submit, to come in and second-guess the managerial judgment and turn this into either a whistle-blowing or criminal case."
  Id. at 36:19-37:3.

First, "the term "jurisdiction" in § 1001 serves a broader purpose than its typical use by the legal system."  Jeremy Baker & Rebecca Young, False Statements and False Claims, 42 Am. Crim. L. Rev. 427, 438 (2005) (citing Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 629 (2001) (adopting a "natural, non-technical" definition of the word jurisdiction for purposes of § 1001 and declining to confine the definition to narrow, technical meaning)).  Rather, "[a] department or agency has jurisdiction, in

this sense, when it has the power to exercise authority in a particular situation.... Understood in

this way, the phrase 'within the jurisdiction' merely differentiates the official, authorized

functions of an agency or department from matters peripheral to the business of that body."

United States v. Rodgers, 466 U.S.475,  479 (1984).  "In a § 1001 context, there is jurisdiction to

prosecute a false statement when the request for information falls within the general authority of

the requesting department or agency." Baker & Young, supra (citing United States v. Shafer, 199

F.3d 826, 829 (6th Cir. 1999) (finding statement originally made to state agency that receives

support from a federal agency is within the jurisdiction of the federal agency for § 1001

purposes)).  Simply put, federal departments and agencies have the power to exercise authority in

a great many matters not completely controlled by those departments or agencies.  U.S. v.

Gibson, 881 F.2d 318, 322 (6th Cir.1989).  "So long as the statements are material, false

statements made in any such matter are within the scope of § 1001."  Id. (internal citation

omitted).

        Jurisdiction also exists regardless of whether the defendant communicated the statement

directly to the government. Id. ("There is no implicit requirement that the statements be made

directly to, or even be received by, the federal department or agency"); U.S. v. Carey, 152 F.

Supp.2d 415, 420 n. 4 (S.D.N.Y. 2001) ("Under § 1001, it makes no difference whether

[defendant's] statements were propelled into the jurisdiction of the federal government, and

therefore into this district, by a private, state or federal actor."); Baker & Young, supra (citing

Shafer, 199 F.3d at 829 (finding statement originally made to state agency that receives support

from federal agency is within jurisdiction of federal agency for § 1001 purposes); United States

v. Calhoon, 97 F.3d 518, 526 (11th Cir. 1996) (stating conviction under § 1001 is possible "even

if [the statement] is ignored or never read by the agency")). Morever, courts have affirmed §

1001 convictions for false statements made to private entities receiving federal funds or subject

to federal regulation or supervision.  Gibson, 881 F.2d at 322 (citing United States v. Kirby, 587

F.2d 876, 881 (7th Cir.1978) (false inspection and weight certificates submitted to private grain

purchaser in transaction subject to regulation by Department of Agriculture); United States v.

Dick, 744 F.2d 546, 554 (7th Cir.1984) (false statements to surety insured by Small Business

Administration); United States v. Brack, 747 F.2d 1142, 1150-52 (7th Cir.1984) (false statements

to surety insured by Small Business Administration), cert. denied, 469 U.S. 1216, 105 S.Ct.

1193, 84 L.Ed.2d 339 (1985); United States v. Green, 745 F.2d 1205, 1208-09 (9th Cir.1984)

(false statements to private firm constructing nuclear power plant regulated by Nuclear

Regulatory Commission), cert. denied, 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985);

United States v. Wolf, 645 F.2d 23, 25- 26 (10th Cir.1981) (false statements to oil company

subject to federal regulation); United States v. Matanky, 482 F.2d 1319, 1322 (9th Cir.) (false

statements to insurance company acting as payment agent for Medicare), cert. denied, 414 U.S.

1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973); United States v. Mouton, 657 F.2d 736, 739 (5th Cir.

Unit A Sept. 1981) (false time sheet submitted to accounting office of community organization

receiving CETA funds); United States v. Cartwright, 632 F.2d 1290, 1292-93 (5th Cir. Unit A

1980) (false statements to savings and loan association insured by FSLIC)).

In Gibson, the defendant was convicted for violating § 1001 after he submitted false

invoices to a private coal mining company.  The coal mining company had a cost-plus contract

with the Tennessee Valley Authority ("TVA") in which the amount that the TVA was charged

depended on the cost of the company's materials and labor. Gibson, 881 F.2d at 320. The

defendant argued that the matter was not within the jurisdiction of a federal agency because the false invoices were not submitted directly to the TVA. Id. at 322.  However, as stated above, the Sixth Circuit noted that "[t]here is no implicit requirement that the statements be made directly to, or even be received by, the federal department or agency." Id.  Because the false invoices were sent to a private company that was required to make regular reports to a government agency, and because the federal agency retained the ultimate authority to see that the federal funds were properly spent, the court concluded that the false statements in the case pertained to a matter that was within the jurisdiction of a federal agency. Id. at 323.  Here, according to the facts as alleged and similar to the coal mining company in Gibson, Cephalon was required to make regular reports to a federal agency, the FDA.[5]  Moreover, Gibson and other cases make clear that although Brennan's audit report was an internal document written for Cephalon, which might never have reached the FDA or been specifically incorporated into any document received by the FDA, that fact would not have shielded Brennan from liability under § 1001 if he had knowingly

---

[5]The RMP, which is dated August 1, 2001 and was in effect at the time of Plaintiff's termination, undermines some of Plaintiff's allegations regarding the responsibilities of pharmaceutical companies, pharmacies and doctors and their effect upon Cephalon's alleged non-compliance with the RMP.  However, Section 10.0 of the RMP is entitled "FDA Reporting" and provides:

> Cephalon, Inc. will provide a quarterly report to the FDA compiled from all data collected by the methods described under the *Actiq* Surveillance and Monitoring Program and Interventions....  This report will describe and provide data on any concerns for child safety, diversion, and off-label usage.  Cephalon, Inc. will also describe any trends and associated interventions made as a a result of concerns raised and will also describe any proposed changes to the *Actiq* Risk Management Plan.  This report will be provided as part of the NDA during the first year of marketing.  The sponsor and FDA will then determine requirements for further reports and their frequency after the first year of marketing.  These reports will be cumulative and contain current reports and identified safety trends.
>
> Actiq Risk Management Program, § 10.0, at 29 (Aug. 1, 2001).

falsified the report.

In <u>U.S. v. Maniago</u>, 987 F.Supp. 234, 235 (S.D.N.Y. 1997), the defendant, an employee of a blood center,  moved to dismiss a count of his indictment that charged him with violation of 18 U.S.C. § 1001 for allegedly having another employee take a "proficiency exam" in his name. The defendant moved to dismiss the charges relating to the proficiency exam on the ground that even if true they did not constitute a violation of Section 1001 because the alleged "exam" did not fall within the jurisdiction of the FDA or any other federal agency.  <u>Id.</u> There, the government submitted the affidavit of an FDA investigator who stated that "exams" such as those at issue are often used by FDA examiners in determining whether blood centers are complying with federal regulations and that a failure to meet these requirements could result in the suspension or revocation of a center's license.  <u>Id.</u> at 235-36.  The court found persuasive the government's argument that the "proficiency examination" at issue here fell squarely within the FDA's "jurisdiction" as that term is used in Section 1001. <u>Id.</u> at 235.  Accordingly, the court found that the FDA had the power to exercise authority in this particular situation, which brought the alleged conduct within the purview of Section 1001.  <u>Id.</u>   Relying upon <u>Gibson</u> for the proposition that courts have affirmed § 1001 convictions for false statements made to private entities subject to federal regulation or supervision, the court found that acts described in the indictment, if true, constituted criminal conduct in violation of 18 U.S.C. § 1001 and denied defendant's motion.  <u>Id.</u> at 235-36.

Here, according to the facts as alleged and similar to the facts in <u>Maniago</u>, the FDA's approval of Actiq was contingent upon Cephalon's adoption of its RMP and a failure to comply could result in the suspension or revocation of Actiq's FDA approval.  Moreover, while the

20

scope of § 1001 is not limitless, and does not extend to "matters peripheral to the business" of the agency involved, United States v. Davis, 8 F.3d 923, 929 (2d Cir. 1993), it cannot be said that the Risk Management Program of a drug is a matter that is just peripheral to the FDA, especially where, as here, the RMP indicates that Cephalon is to provide regular reports to the FDA. Therefore, the Court finds that Plaintiff's audit report is within the jurisdiction of the FDA for the purposes of § 1001.

Second, Plaintiff must also plead that the report which he was allegedly directed to fabricate was material. Courts have considered a statement to be material under § 1001 if it either: (i) actually influenced or (ii) has a natural tendency or capacity to influence a decision or function of a federal agency. Baker & Young, supra at 435 (citing United States v. Gaudin, 515 U.S. 506, 509 (1995) (finding statement material if it has "a natural tendency to influence or [is] capable of influencing" an agency); United States v. Rashid, 383 F.3d 769, 779 (8th Cir. 2004) (holding that simply because the defendant's false statement did not actually influence the bank, did not make it immaterial under § 1001); United States v. Chen, 324 F.3d 1103, 1104 (9th Cir. 2003) (holding that defendant's false statement that he entered the country only two months prior to filing an asylum application was material because it could have affected an investigation of illegal alien smuggling)). The agency need not have actually believed or even received the false statement for the materiality requirement to be met. Id. (citing State v. Sarihifard, 155 F.3d 301, 306-07 (4th Cir. 1998) (rejecting Petitioner's argument that his false statements were not material because United States Attorney recognized instantly that statements were false); United States v. Rutgard, 116 F.3d 1270, 1287 (9th Cir. 1997) (stating § 1001 criminalizes false statements made to federal agency as well as false entries concealing material facts); United States v. LeMaster, 54

F.3d 1224, 1230 (6th Cir. 1995) (explaining false statement may be material even if agent who hears it suspects it is false)).  A voluntary, non-mandatory statement may also qualify as material. Id. (citing United States v. Ross, 77 F.3d 1525, 1546 (7th Cir. 1996) (holding the fact that a statement was not required does not make that statement any less material); United States v. Dick, 744 F.2d 546, 553 (7th Cir. 1984) (explaining non-required statement is no less material than mandatory one)).  The Court finds that Plaintiff's audit report was capable of influencing the FDA because it analyzed whether Cephalon was in compliance with its RMP, which was created in order to obtain the FDA's approval of Actiq , and to "ensure the safe use of [Actiq]."  RMP § 1.0, at 5.

Third, at oral argument, Plaintiff contended that a number of Defendants' positions--namely those relating to Cephalon's chain of command, frequency of reporting to the FDA, and business judgment--should not be before the Court on a motion to dismiss because "[n]one of the facts ... recited [by Defendants] are in this record."  Second Oral Arg. Transcr. at 38:16-17.  In In re Tower Air, Inc., 416 F.3d 229 (3d Cir. 2005), a recent Third Circuit case, the defendant's motion to dismiss articulated the plaintiff's claims that supposedly lacked factual support.  The Third Circuit explained that "a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts" because to "say that a plaintiff's claim appears factually weak is not to say that he states no claim."  Id. at 237-38.  The court reiterated that "supporting facts should be alleged, but only those necessary to provide the defendant fair notice of the plaintiff's claim and the 'grounds upon which it rests.'"  Id. at 237.  The court also noted that "to hold otherwise would be effectively to transform Rule 12(b)(6) motions into multi-purpose summary judgment vehicles. That we will not do."  Id. at 238.  Here, I find that Cephalon has represented certain

facts to the Court regarding the RMP which are not part of the record on this motion to dismiss. Furthermore, it is clear that discovery is required to flesh out the RMP requirements and the manner of reporting to the FDA.

In the context of a motion to dismiss, this Court is satisfied that Plaintiff has stated a claim that he could have faced criminal liability pursuant to 18 U.S.C. § 1001 had he knowingly falsified his audit report[6] at Cephalon's direction, as alleged. Therefore, the Court finds that Plaintiff has stated a claim against Cephalon for wrongful discharge pursuant to Pennsylvania's "commit a crime" exception to at-will employment that is sufficient to withstand a 12(b)(6) motion. As such, Plaintiff's motion for leave to amend that claim is granted and Defendants' motion to dismiss that claim is denied. If, after discovery, Cephalon find that these allegations lack evidentiary support, it may move for summary judgment.

### C.  Plaintiff's Wrongful Discharge Claim Against the Individual Defendants

Plaintiff is also asserting his wrongful discharge claim against Cephalon employees Frank Baldino[7], Richard Kaplan, Tim Sheehan and Armando Cortez (Collectively, "Individual Defendants"). Individual Defendants argue that they cannot be sued in their individual capacities for wrongful discharge because such a claim is not available against individual employees in Pennsylvania. In support of this argument, Defendants cite <u>Hrosik v. Latrobe Steel Co.</u>, 1995 WL 456212 (W.D. Pa. Apr. 25, 1995). In <u>Hrosik</u>, the district court held that a wrongful

---

[6]Since the Court has found that Plaintiff could have faced criminal liability for § 1001 falsification, the Court need not decide whether he could have faced liability for § 1001 concealment by operation of 18 U.S.C. § 2(b).

[7]The Court dismissed Baldino from this case in its Opinion and Order of March 24, 2005.

discharge claim only exists against an employee's employer, and because the plaintiff did not allege that the individual defendants were his employer, the court dismissed the claim against them. Id. at 17.  In response, Plaintiff cites to DeMuro v. Philadelphia Housing Authority,1998 WL 962103, *5 (E.D. Pa. Dec. 22,1998), in which the district court sitting in the Eastern District of Pennsylvania was "not convinced that [Hrosik] rests upon a sound foundation."  The DeMuro court explained that the district court in Hrosik cited two cases--Yetter v. Ward Trucking Corp., 585 A.2d 1022 (Pa. Super.1991), and Leslie v. The Philadelphia 1976 Bicentennial Corp., 332 F.Supp. 83 (E.D. Pa.1971)--in support of the proposition that a wrongful discharge claim exists only against an employee's employer, and stated that "[n]either of theses cases supports this proposition."  Id.  It continued:

> Yetter is a case where a wrongful discharge action was dismissed against an employer, the Ward Trucking Company, because the complaint failed to state a claim for wrongful discharge under Pennsylvania law. There is no discussion about the liability of individual employees. In Leslie, the district court found that, in discussing the liability of corporate officers in their individual capacities, they cannot be held liable unless it is alleged that they acted towards the plaintiff in an individual capacity and not in their corporate capacities, no discussion of Pennsylvania law on wrongful discharge takes place in the opinion. A review of all of the dozens of cases that subsequently cite these two cases reveals that only Hrosik cites them for the above proposition. Id.

Accordingly, in Demuro, the court ruled that "Hrosik does not provide an argument to dismiss the wrongful discharge claim against the defendants in their individual capacity."  Id. Aside from Hrosik, Defendants have cited no cases in support of their assertion that under Pennsylvania law a wrongful discharge claim exists only against an employer.

While the holdings in Hrosik and DeMuro are at odds with each other, this Court finds a distinction set forth in Leslie to be persuasive.  In Leslie, the court stated that in order for the

plaintiff to state a claim against individual employees for discharge, it is "necessary that [the plaintiff] allege that [individual defendants] acted in individual capacities, as opposed to corporate capacities." Leslie., 332 F.Supp. at 93.  Here, not only has Plaintiff not alleged that any of the individual defendants named in the Third Amended Complaint orchestrated his discharge or personally directed him to commit a crime,[8] but he has not alleged that any of them acted outside of their corporate capacities.  Moreover, Baldino, Cephalon's CEO, is not mentioned in any of Plaintiff's factual allegations and was already dismissed from the case in the Court's Opinion and Order of March 24, 2005.

Plaintiff argues that he should be afforded additional time through discovery to determine Individual Defendants' roles, if any.  If Plaintiff ever discovers such a basis, at that time he may seek leave to amend the Complaint once again, in order to add that person as a party.  At this juncture, however, Plaintiff's complaint does not state a claim against any of the Individual Defendants.  Therefore, Plaintiff's claims against Individual Defendants are dismissed without prejudice.

### D. Plaintiff's Contract/ERISA Claim

Defendants have also moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiff's breach of contract and ERISA claims.  Plaintiff alleges that he is entitled to severance pay as outlined in a severance agreement and that "as part of his employment contract, the plaintiff is entitled to severance pay and other benefits due to his being fired by Cephalon."  Third Am. Compl, Count III, ¶ e.  He also alleges that "it is the policy and practice of Cephalon to provide

---

[8]Tracie Parker, the only individual whom Plaintiff identifies as seeking to coerce him to falsify his report, is not a named defendant.

severance pay and other benefits to terminated employees." <u>Id.</u> at ¶ f.

Although severance benefits are not specifically mentioned in ERISA, 29 U.S.C. §
1002(1), courts have determined that most, but not all, severance packages qualify as ERISA
plans. <u>See, e.g.,</u> <u>Schonholz v. Long Island Jewish Med. Ctr.,</u> 87 F.3d 72, 75 (2d Cir.1996). In
<u>Fort Halifax Packing Co. v. Coyne</u>, 482 U.S. 1 (1987), however, the Supreme Court held that
severance benefits do not implicate ERISA unless they require the establishment and
maintenance of a separate and ongoing administrative scheme. <u>Id.</u> at 11-12; <u>see also</u> <u>Pane v. RCA</u>
<u>Corp.,</u> 667 F.Supp. 168, 170 (D.N.J.1987), <u>aff'd</u>, 868 F.2d 631 (3d Cir.1989).

Under section 1144(a) of ERISA, state common law claims are preempted as they relate
to "claim[s] for benefits under the ERISA-regulated benefit plan." <u>Pilot Life Ins. Co. v. Dedeaux</u>,
481 U.S. 41 (1987). Therefore, to the extent that Brennan's breach of contract claim relates to
benefits under an ERISA-regulated plan that claim would be preempted by ERISA.  The issue for
the Court to decide is whether Plaintiff has pleaded the existence of a contract and/or an ERISA plan.

Plaintiff admits that he did not sign or enter into the severance agreement and also admits
that he did not have a written employment contact.  At the first oral argument, Plaintiff indicated
that representations were made to him that would constitute a contract.  In response, I stated:

> But when I look at paragraph 5, and it says 'as part of his employment contract,'
> of course, that doesn't tell me it's written or oral.  I understand that has been
> fleshed out in your briefing;  you are not asserting it's written.  You are now
> telling me it's oral.  That's not alleged in the complaint that they were
> representations made to him, and even under notice pleading you have to say that
> because this doesn't do it.
> First Oral Arg. Transcr. at 6:24-7:7.

I finally stated:

26

> [A]t this point, there is no contract claim because I've already said, one, I don't find it's been properly pled in  paragraph 5; and paragraph 6, I'm not reading that as  a contract claim. So I'm going to allow you to amend to assert an ERISA claim.  In the alternative, if it's determined it's not ERISA, then that determination can  be made at that point. So the contract claim as pled is dismissed.  You will be given leave to file an amended complaint   asserting an ERISA claim if you believe you can do so based upon the facts and information that you have received from your client in good faith.

<u>Id.</u> at 11:22-12:10.

Plaintiff has done nothing to cure the deficiencies of his breach of contract claim. Plaintiff does not allege that there exists a written contract.  Instead, he alleges, in effect, that since it was the policy and practice of Cephalon to pay severance to terminated employees, there exists an oral contract between him and Cephalon for severance benefits, which Cephalon has breached.

To establish a cause of action for breach of contract, a plaintiff must allege, <u>inter alia</u>, the existence of a contract, including its essential terms. <u>Corestates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super.1999).  Therefore, to state a claim for breach of an oral contract, a plaintiff must plead the existence of an oral contract by alleging that (1) both parties have manifested an intent to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and (3) there is a mutuality of consideration. <u>See</u> <u>Redick v. Kraft Inc.</u>, 745 F. Supp. 296 (E.D. Pa. 1990) (citing <u>Channel Home Centers v. Grossman</u>, 795 F.2d 291, 298-99 (3d Cir. 1986)).  The Court finds that Plaintiff has not alleged the existence of an oral contract.  There is no manifest intent alleged; indeed it is Plaintiff who rejected Cephalon's offer of severance pay.  Moreover, there is no mutuality of consent alleged because Plaintiff did not agree to the conditions Cephalon placed upon its offer of severance pay.

27

Furthermore, Plaintiff's allegation that an ERISA plan exists as a result of Cephalon's "policy

and practice" belies his allegation that he had an individual severance agreement with Cephalon.

Plaintiff has not cured the deficiencies in stating a contact claim for severance benefits.

> Plaintiff makes the following ERISA-related allegations:
>
> It is the policy and practice of Cephalon to provide severance pay and other benefits to terminated employees.
> . . .
> In the alternative, plaintiff is entitled and Cephalon is obligated to pay plaintiff the compensation and benefits in question upon his termination in accordance with the ERISA and Cephalon's plan
>
> Third Am. Compl. Count III, ¶¶ f, i.

Plaintiff argues in his Opposition brief that he "is in need of discovery in order to 'establish' the

allegations concerning" this Count and has not identified an existing written or formal ERISA

plan.[9]  Instead, his "policy and practice" allegation suggests that Cephalon unintentionally

created an ERISA severance plan.  Defendants argue that Plaintiff has not pleaded the existence

of an ERISA claim which was intentionally or unintentionally created by Cephalon.[10]

> It is well-established that "employers that pay severance to employees as a fairly regular

---

[9]In paragraph h of Count III, Plaintiff alleges: "The defendant Cephalon asserted that the plaintiff's compensation and benefits which plaintiff was to receive upon termination is regulated by the Employee Retirement Income Security Act (ERISA) under a plan adopted by Cephalon. (Plaintiff would need discovery as to Cephalon's ERISA representations.)" Third Am. Compl. Count III, ¶ h.  However, that allegation mischaracterizes Defendants' position.  Plaintiff's original complaint asserted a breach of contract claim but not an ERISA claim.  Defendants merely argued that Plaintiff's allegation regarding Cephalon 's "policy and practice" of paying severance implicated ERISA, which could preempt any contract claim asserted by Plaintiff; they never asserted that an ERISA plan exists.

[10]Defendants also argue that even if Plaintiff has alleged the existence of an ERISA plan, he has not alleged that he is entitled to any severance other than that conditionally offered in the severance agreement into which he did not enter.

practice unwittingly may have created ERISA severance plans, even though there is no written plan or policy providing for such payments." Payments to Departing Employees: Inadvertant Creatin of an ERISA-Governed Severance Plan, 3 No. 9 Employment Law Strategist, 1 (1996). However, "[s]ince ERISA applies to a severance arrangement only if it rises to the level of a 'plan,' it is essential to determine whether a plan exists in a given set of circumstances." Id. The key to determining whether an ERISA severance plan exists is the "degree to which administration is involved in the arrangement." Id. "[S]everance benefits that are of a strictly one-time nature and do not require ongoing administrative involvement by the employer" will not constitute ERISA plans. On the other hand, "an employer's regular, but unwritten, practice of paying severance calculated on a determinable basis is like to constitute an ERISA plan." Id.

The Supreme Court has clearly delineated the legal standards for determining whether a severance agreement constitutes an ERISA plan. The decisive inquiry is whether the agreement "requires an ongoing administrative program to meet the employer's obligation." Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 11 (1987). ERISA is implicated when a severance plan places "periodic demands on [an employer's] assets that create a need for financial coordination and control." Id. at 12. In Fort Halifax, the Supreme Court analyzed a Maine statute that required employers who shut down operations to make one-time severance payments to their employees. The Supreme Court held that although the one-time payment constituted a benefit, it did not constitute a benefit plan implicating ERISA. Id. "The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation." Id.

According to the Third Circuit, "[a]n ERISA plan exists if from the surrounding

circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits. ... [T]he crucial factor in determining whether a "plan" has been established is whether the employer has expressed an intention to provide benefits on a regular and long-term basis."  Gruber v. Hubbard Bert Karle Weber, Inc., 159 F.3d 780, 789 (3d Cir. 1998); see also Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 399 (3d Cir. 1992) ("In determining whether a plan, fund, or program (pursuant to a writing or not) is a reality, a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.").

     Plaintiff makes no allegations having to do with the benefits, beneficiaries, administrator, funding, procedures, intentions of Cephalon and involvement of Cephalon with regard to the alleged plan.  As such, the Court finds that Plaintiff has failed to plead the existence of an official or unofficial ERISA plan.  Therefore, Plaintiff's motion for leave to file an amended Count III, which asserts a claim for breach of contract or one for benefits pursuant to an ERISA plan, is denied, and Defendants' motion to dismiss that Count is granted.  Plaintiff's contract and ERISA claims are dismissed without prejudice.[11]

--------

[11]In addition to suing Cephalon, Plaintiff is asserting all claims against Cephalon employees Frank Baldino, Richard Kaplan, Tim Sheehan and Armando Cortez. However, in his own Brief in Opposition to Defendants' first motion to dismiss, Plaintiff stated: "Plaintiff agrees that the individual defendants should not have been listed in the Wherefore clause of the Third Count [which brought the contract claim]. Such was an error and the Third Count claims against the individual defendants should be dismissed." Pl.'s First Opp. Br. at 25.  Moreover, claims for ERISA benefits pursuant to § 502(a)(1)(B) can only be brought against an ERISA plan or plan administrator or a fiduciary of a plan.  Curcio v. John Hancock Mutual Life Ins. Co, 33 F.3d 226, 233 (3d Cir. 1994). Therefore, Plaintiff's contract and ERISA claims against Individual Defendants are also dismissed.

**E.  Plaintiff's Claim for "Free Speech" Wrongful Discharge**

In his Third Amended Complaint, Plaintiff asserts a claim for Constitutional Wrongful Discharge.  He alleges that his "complaints, statements, communications, whistle blowing actions, etc., ... are protected free speech by the United States Constitution First Amendment, U.S.C.A. Const. Amend.§ 1 and 14 and the Pennsylvania Constitution Article I, Section 7" and that his "discharge for engaging in such free speech is a wrongful discharge in violation of a clear mandate of public policy." Third Am. Compl., Count VI, ¶¶ 2-5.

Plaintiff explains that the claim is based upon Novosel v. Nationwide Ins Co., 721 F.2d 894 (3d Cir. 1983), in which the Third Circuit found that under Pennsylvania law, the plaintiff's firing for disagreement with his employer's legislative agenda and/or his refusal to lobby the state legislature on the employer's behalf sufficiently implicated a recognized facet of public policy so that the plaintiff stated a claim for wrongful discharge.  In response, Defendants point to Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107 (3d Cir. 2003).   In Fraser, the Third Circuit rejected the plaintiff's argument that "[i]n light of Novosel, ... [the court] should view the First Amendment of the United States Constitution and the Pennsylvania Constitution as limitations on employers' discretion to fire at-will employees."  Fraser, 352 F.3d at 112.  The court explained that it has "declined to read Novosel so broadly and, indeed, ... previously rejected [plaintiff]'s position" in Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 619 (3d Cir. 1992).  In Borse, the court noted that "the Superior Court has refused to extend constitutional provisions designed to restrict governmental conduct in the absence of state action" in Martin v. Capital Cities Media, Inc., 354 Pa.Super. 199, 511 A.2d 830, 844 (1986) and Cisco v. United Parcel Servs., Inc., 328 Pa.Super. 300, 476 A.2d 1340, 1344 (1984).  Borse, 963 F.2d at 619.   In Borse, the court also "predict[ed]

that if faced with the issue, the Pennsylvania Supreme Court would not look to the First ...

Amendment[ ] as [a] source[ ] of public policy when there is no state action." Id. at 620.

Moreover, in Fraser, the Third Circuit noted that Pennsylvania courts "have repeatedly rejected

claims that a private employer [as opposed to a public employer] violated public policy by firing

an employee for whistleblowing, when the employee was under no legal duty to report the acts at

issue." Fraser, 352 F.3d at 112 (quoting Donahue v. Fed. Express Corp., 753 A.2d 238, 244 (Pa.

Super. 2000)).  As a result, Novosel has been limited to its facts--a firing based on forced

political speech.  Id. at 112-13.

Here, Plaintiff does not allege that he was fired based on forced political speech.

Therefore, Novosel cannot be the basis for his claim for wrongful discharge based on exercising

his rights to free speech under the United States and Pennsylvania constitutions.  As such,

allowing Plaintiff to assert this claim would be futile and his motion for leave to file this claim is

denied.[12]

## V.  CONCLUSION

For the reasons stated above, Plaintiff's motion for leave to amend his complaint is

granted in part and denied in part and Defendants' motion to dismiss is granted in part and

denied in part: 1) Plaintiff's motion for leave to amend his claim for wrongful discharge against

Cephalon is granted, and Defendants' motion to dismiss that claim is denied as to Cephalon;  2)

Plaintiff's motion for leave to amend his claim for breach of contract is denied, and that claim is

---

[12]For the same reasons, this claim is also dismissed as to the Individual Defendants, whom Plaintiff does not even allege terminated him as a result of the alleged violation of his "free speech" rights.

dismissed without prejudice; 3) Plaintiff's motion for leave to amend his claim for benefits

pursuant to an ERISA plan is denied, and that claim is dismissed without prejudice; 4) Plaintiff's

motion for leave to amend his complaint in order to assert an additional claim for "free speech"

wrongful discharge is denied on futility grounds;  5) All claims against Frank Baldino, Richard

Kaplan, Tim Sheehan, and Armando Cortez are dismissed without prejudice.  Therefore,

Plaintiff's claim for wrongful discharge against Cephalon is the only remaining claim in this

case.

Dated: October  25 , 2005

                                                    S/ Freda L. Wolfson
                                                    Honorable Freda L. Wolfson
                                                    United States District Judge

33