UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DAVID BRENNAN, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 04-3241 (NLH) |
| v. | : | |
| | : | |
| CEPHALON, ET AL., | : | OPINION |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

Mario A. Iavicoli, Esq.
43 Kings Highway West
Haddonfield, NJ 08033
*Attorney for Plaintiff David Brennan*

Michael J. Eagles, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
*Attorney for Defendant Cephalon*

**HILLMAN**, District Judge

This matter comes before the Court upon defendant Cephalon Inc.'s ("Cephalon") motion for summary judgment to dismiss plaintiff's complaint for wrongful termination.  Because we find that plaintiff was an at-will employee and his termination did not violate any clear mandate of public policy, we grant defendant's motion.

**I.   PROCEDURAL BACKGROUND**

Plaintiff filed his complaint in the Superior Court of New Jersey, Law Division, Camden County on June 3, 2004.  He

subsequently filed an amended complaint that was removed to this Court upon notice of removal by the defendants on July 8, 2004. On July 15, 2004, defendants filed a motion to dismiss the amended complaint.  Following oral argument before Judge Freda L. Wolfson,[1] the Court ruled that Pennsylvania law applied and issued an Order on March 2, 2005, granting defendants' motion in part and denying it in part with leave for plaintiff to file a second amended complaint.[2]  By Order dated March 24, 2005, the Court also dismissed plaintiff's Civil Rights Act claims against all defendants and dismissed plaintiff's claims against defendant Baldino without prejudice.

Plaintiff filed a second amended complaint on April 7, 2005, and defendants filed a motion to dismiss the second amended complaint shortly thereafter.  Before Judge Wolfson ruled on the motion to dismiss the second amended complaint, plaintiff filed a motion for leave to file a third amended complaint.  Judge Wolfson decided both motions by Order and Opinion entered on October 25, 2005.  Brennan v. Cephalon, Inc., No. 04-341, 2005 WL 2807195 (D.N.J. Oct. 25, 2005).  In that Opinion, the Court held

---

[1] This case was originally assigned to Judge Freda L. Wolfson.  It was reassigned to this Court on July 5, 2006.

[2] In that Order: plaintiff's wrongful discharge claim was dismissed without prejudice; plaintiff's claim under the New Jersey Conscientious Employee Act, N.J.S.A. 34:19, was dismissed with prejudice; plaintiff's state law breach of contract claim for severance benefits was dismissed without prejudice; and plaintiff's prima facie tort claim was dismissed with prejudice.

that plaintiff stated a claim against Cephalon for wrongful termination under Pennsylvania's "commit a crime" exception to at-will employment sufficient to withstand a 12(b)(6) motion. Id. at 12. The Court dismissed plaintiff's claims for wrongful discharge against Cephalon employees, Frank Baldino, Richard Kaplan, Tim Sheehan and Armando Cortez because plaintiff did not allege that any of them acted in their individual capacities as opposed to their corporate capacities. Id. at 13. In addition, the Court dismissed plaintiff's ERISA claims without prejudice. Id. at 16. Finally, the Court denied plaintiff's motion for leave to amend his complaint to add a claim for wrongful discharge based on exercising his rights to free speech under the United States and Pennsylvania constitutions since plaintiff did not allege that he was fired based on forced political speech. Id. at 17.

Following Judge Wolfson's Order, all defendants with the exception of Cephalon have been dismissed, and all claims against Cephalon have been dismissed except for plaintiff's claim of wrongful termination. Defendant Cephalon has filed a motion for summary judgment on that remaining claim.

## II.  FACTUAL BACKGROUND

We adopt the facts as presented in the Court's October 25, 2005, Opinion and either reiterate or supplement the following

facts. Brennan was hired by Cephalon, a biotechnology and drug company, in March 2002 as a compliance auditor. Cephalon had received approval from the FDA to market a drug called Actiq. Actiq was described as a narcotic painkiller designed to provide relief from pain to cancer patients. Part of the FDA approval for Actiq included a requirement that Cephalon provide quarterly reports for the first year of marketing. Thereafter, Cephalon and the FDA would determine the requirement for further reporting. Brennan, at the request of Cephalon, conducted an audit of Actiq's Risk Management Program ("RMP") and concluded that Cephalon was not in compliance with the FDA approval. He turned in his report to his supervisor, Tim Sheehan, in October 2003. In November 2003, Brennan, Sheehan, Armando Cortes, the new Director of Quality Assurance, and Richard Kaplan, Vice President of Quality, conducted an audit of Orsymonde, a facility owned by Cephalon in France, in which they concluded that the facility was generally in compliance.[3]

After the conclusion of the Orsymonde audit, Brennan noted that it had been six weeks since he submitted his Actiq RMP report but had not received any response. Brennan mentioned this to a co-worker, Lisa Carle, and stated to her that he thought he

---

[3] Brennan testified that Orsymonde manufactures Modafinil which is the active ingredient for Provigil, and that a significant percentage of Cephalon's revenue comes from Provigil. Brennan Dep. at 75-76. The Orsymonde audit is unrelated to the Actiq audit.

should report his findings on the Actiq RMP to the FDA.  Brennan did not have any conversations with his superiors about turning over his findings directly to the FDA.  Within the next day or so after speaking with Ms. Carle, Cortes met with Brennan, Sheehan and Kaplan about the Actiq RMP report.  At that meeting, Brennan was told to set up a meeting with the other participants in the Actiq RMP audit to assure that correct information was provided.  Brennan set up the meeting for December 1, 2003.  During the meeting, a co-worker, Tracie Parker, who had no authority over Brennan, told Brennan that the Actiq RMP report should not state that Cephlon was noncompliant and to remove her name.  Ms. Parker then left the meeting and returned with Kaplan.  Kaplan did not ask Brennan to change the report.  Brennan did not alter his conclusions and the report was distributed internally.  Carol Marchione, Director of Quality Assurance was to respond to the report by December 31, 2003, but it was agreed by Brennan and others that the response date should be moved to January 31, 2004.  Brennan did not receive a response to the report by the deadline, and on February 9, 10, 11 and 12, 2004, he approached Sheehan and asked him if he could distribute the Actiq RMP report.  Sheehan told him no, that he had to wait for approval from Cortes.  Brennan did not contact Cortes.

  About the same time period that the response to the Actiq RMP report was pending, a consultant named Debra Bennett had been

hired by Cephalon to do a mock FDA inspection in January 2004 of the Orsymonde facility in anticipation of an official FDA inspection.[4]  In her report dated February 6, 2004, Ms. Bennett identified several areas where the Orsymonde facility was in violation and needed corrective action.  It also stated that the last audit conducted in November 2003 was inadequate.  Brennan testified that prior to his termination he had heard about "... a report that says they're [Cephalon] totally out of compliance in Orsymonde."[5]  Brennan Dep. at 114-15.  Brennan stated that he had asked Sheehan during the week of February 9-12, 2004 to see Bennett's report but his request was denied.  He did not request to see the report from anyone else.

On February 12, 2004, Brennan and Sheehan were terminated. Brennan's letter of termination stated that he was terminated because of his performance regarding the audit at the Orsymonde facility in November 2003.  During his deposition, Brennan testified that he thought he was fired because "[he] believe[d] that Cephalon was committing some illegal activities, and [] wanted them to stop doing it, or report them appropriately to the FDA."  Brennan Dep. at 31.  A week or so after his termination,

---

[4] Brennan testified that Bennett had been hired several times before by Cephalon to conduct similar inspections at their other facilities.  Brennan Dep. at 106.

[5] Material submitted by Cephalon state that corrective action was taken at the Orymonde facility based on Bennett's mock inspection.

Brennan sent a letter to the FDA regarding Cephalon's noncompliance.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir.

2004)(quoting <u>Anderson</u>, 477 U.S. at 255).

    Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u> Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**B.   Claim for Wrongful Discharge**

    The parties do not dispute that Brennan was an at-will employee of Cephalon. Under Pennsylvania Law, an at-will employee can be terminated for any reason, good or bad, or for no reason at all. <u>Brennan</u>, 2005 WL 2807195, at *6. (citing <u>Krajsa v. Keypunch, Inc.</u>, 622 A.2d 355, 358 (Pa. Super. 1993)). The exception to this rule is where the termination would threaten clear mandates of public policy. <u>Id.</u> (citing <u>Clay v. Advanced Computer Applications, Inc.</u>, 559 A.2d 917, 918 (Pa. 1989)). The

three areas recognized under the public policy exception prohibit an employer from: (1) requiring an employee to commit a crime; (2) preventing an employee from complying with a statutorily imposed duty; and (3) discharging an employee when specifically prohibited from doing so. Id. (citing Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. 1998)).  Whether the public policy exception applies is determined on a case by case basis.  Clark v. Modern Group Ltd., 9 F.3d at 321, 327-28 (3rd Cir. 1993).

The Court, in its October 25, 2005 Opinion, ruled that "the third public policy exception is clearly not applicable here because there is no statute that prohibits Cephalon's termination of Brennan."  The Court also ruled that the second public policy exception did not apply because the statutes that Brennan identified did "not implicate the 'statutorily imposed duty' public policy exception to at will employment."  Brennan, 2005 WL 2807195, at *6.  The Court found that the four statutes that Brennan identified, 18 U.S.C. § 1001, 18 U.S.C. § 371, 18 Pa. C.S.A. 4911, and 21 U.S.C. § 333[6] did "... not impose

---

[6] Specifically, the Court provided:

The False Statements Act ("FSA"): Section 1001 of Title 18 of the United States Code, makes it a crime to knowingly and willfully make a false statement to the United States or to any department or agency thereof.

18 U.S.C. § 371 prohibits conspiracies "to commit any offense against the United States, or to defraud the United States, or any agency

specifically delineated statutory affirmative duties upon Plaintiff, nor [did] they advance the 'one-step removed' argument – that Cephalon had statutory duties and those duties were imputed to plaintiff by virtue of his job and duties as compliance auditor." Id.

In his response to the motion for summary judgment, Brennan attempts to resurrect his theory that he had a "statutory duty" to submit the Actiq non-compliance information to the FDA.[7]  This

---

> thereof.." 18 U.S.C. 371.
>
> A person violates 18 Pa.C.S.A. § 4911 if he or she:
> (1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government; (2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or (3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing. 18 Pa.C.S.A. § 4911.
>
> 21 U.S.C. § 333 is a lengthy statute that [imposes] criminal penalties for violations of other FDA statutes, none of which have been cited by Plaintiff or are applicable here.

Id. at *7.

[7] In their reply, Cephalon objects to Brennan's response on a number of grounds and requests that this Court impose sanctions upon plaintiff for submitting a statement of facts and declaration that fails to properly cite to the record and

argument, again, is without merit.[8]  The existence of an affirmative statutory duty is a strict requirement imposed by the Pennsylvania Courts in order to meet the "statutorily imposed duty" exception to at-will employment. Compare Brown v. Hammond, 810 F. Supp. 644, 647 (E.D.Pa. 1993) (termination of employee for reporting employer's improper billing practices did not violate "clearly mandated public policy required to satisfy the very narrow exception to Pennsylvania's rigid at will employment doctrine."); and Spierling v. First American Home Health Services, Inc., 737 A.2d 1250, 1254 (Pa. Super. 1999), appeal denied, 786 A.2d 989 (Pa. 2001)(nurse had no duty to report past Medicare fraud); and Diberardinis-Mason v. Super Fresh, 95 F. Supp.2d 626, 629 (E.D.Pa. 2000)(plaintiff had no statutory duty where language of the statute did not reveal any affirmative

---

contains misrepresentations, and for exceeding the page limit. While do not impose sanctions upon plaintiff, we do seriously caution him that his submissions must comport with the Federal Rules of Civil Procedure and the Local Rules of this Court.  In deciding this motion, we did not give credence to unsupported assertions but relied upon facts supported by the record and the deposition testimony of Brennan.  Upon written request by plaintiff submitted to the Court for permission to file an extra six pages beyond the 40 page limit, we grant plaintiff's request, nunc pro tunc.

[8] To the extent that plaintiff is trying to argue that he had a duty to report his findings to the FDA under a general sense for protecting the public interest, such theory has been rejected by the Third Circuit.  In Clark v. Modern Group Ltd., 9 F.3d 321, 328 (3d Cir. 1993), the Court concluded that Pennsylvania law does not recognize a clear mandate of public policy absent "a legislative or constitutional endorsement in the form of a specific prohibition, requirement or privilege."

reporting duty); with Field v. Phila. Elec. Co., 565 A.2d 1170 (Pa. Super. 1989)(federal statute required employee to report violations of nuclear regulations); and Reuther v. Fowler & Williams, Inc., 386 A.2d 119, 121 (Pa. Super. 1978)(plaintiff had affirmative duty to appear for jury service).

In Spierling, the federal government had investigated First American Home Health Services, Inc. ("First American") for Medicare fraud and told Spierling, a nurse, and other employees to call the fraud hotline to report suspected Medicare fraud. 737 A.2d at 1251. Spierling went through some "old and discarded" files at First American and found evidence of Medicare fraud. Id. She reported it to her supervisor who in turn called the hotline and notified the regional vice president of First American. Three days later Spierling and the supervisor were terminated. Id. Spierling argued that a duty to report Medicare fraud arose from: 18 U.S.C. § 1001; 18 U.S.C. § 287; 42 U.S.C. §§1320a-7a and 1320a-7b; 31 U.S.C. § 3729 or 31 U.S.C. § 3730(h); the Professional Nursing Law, 63 P.S. §§ 211225.5; and Pennsylvania Code sections relating to nursing, 49 Pa.Code § 21.18. Id. The court held that Spierling was "under no statutorily imposed duty to report the suspected past Medicare fraud, Defendant-Appellees did not request that Spierling commit a crime and there was no specific statutory prohibition against Spierling's discharge." Id. The court concluded that the

employer was within its right to discharge her as an at-will employee.[9] Id. In contrast, in Field the court found that Field was wrongfully terminated because he reported violations to the Nuclear Regulatory Commission ("NRC"). 565 A.2d at 1180. Under the Energy Reorganization Act, Field had an affirmative duty to report such violations to the NRC. Id. The ERA "provides that any individual of a firm operating a licensed nuclear facility who obtains information which indicates that the facility has failed to comply with any provision of the NRC regulations is required to notify the NRC of the failure." Id. at 1176 (citing 42 U.S. § 5846). Individuals who fail to report violations are subject to fines. Id.

What these cases portray is a requirement under Pennsylvania law that in order for a plaintiff to prevail on a theory of statutory duty, he must point to a clear affirmative duty to report. Even though Brennan was given the responsibility of conducting an internal audit by Cephalon, Brennan did not have an affirmative statutory duty to report the findings from his audit directly to the FDA. The statutes that Brennan identifies only proscribe the filing of false statements.

Affirming that Brennan does not meet the "statutorily

---

[9] The court noted that "First American was assessed a substantial fine and its corporate president was sentenced to a term of imprisonment as a result of Medicare fraud." Id. at 1251 n. 3.

imposed duty" exception, we turn to whether plaintiff's claim that he could have been criminally liable had he falsified his reports and potentially "committed a crime" survives summary judgment.  Pennsylvania law requires that in order for a plaintiff to present a claim under the "commit a crime" public policy exception to at-will employment, the employee must show that he was terminated by his employer for his refusal to commit a crime as part of his employment.  See Woodson v. AMF Leisureland Centers, Inc., 842 F.2d 699, 702 (3d Cir. 1988)(employee wrongfully terminated for refusing to serve visibly intoxicated person in violation of Pennsylvania law); Dugan v. Bell Telephone of Pennsylvania, 876 F. Supp. 713, 725(W.D.Pa. 1994)(employee wrongfully terminated if he was fired for refusal to engage in illegal activity of destroying records subpoenaed by the Pennsylvania State legislature); Levito v. Hussman Food Service Co., No. 89-5967, 1990 WL 1426, at *3 (E.D.Pa. Jan. 8, 1990)(employee wrongfully terminated for refusing to engage in illegal kick-back scheme); Spriegel v. Kensey Nash Corp., No. 93-08714, 1995 WL 908192, at *3 (Pa.Com.Pl. Dec. 11, 1995)(employee wrongfully terminated for refusing to perform animal studies in violation of federal and state law).

    It seems that Brennan is arguing that had he been forced to change his conclusion in his Actiq RMP report from noncompliance

14

to compliance, he would have been engaging in illegal conduct in violation of the False Statements Act, 18 U.S.C. § 1001, conspiracy to submit false statements, 18 U.S.C. § 371, Pennsylvania statutes prohibiting false statements, 18 Pa. C.S.A. 4911, and criminal penalties for violation of FDA regulations, 21 U.S.C. § 333.  We agree that if Brennan has evidence that could establish that he was fired for his refusal to change his report, then his claim should go to the jury.  The facts, however, do not support this claim.  The only individual who told him that the report should be changed was a co-worker who had no supervisory authority over Brennan.  In fact, immediately after she made that statement, she left the room to retrieve Kaplan who did have authority over Brennan.  Kaplan did not tell Brennan to change his conclusion, or even suggest that he do so.  Rather, Brennan's report was reviewed by his superiors who in turn submitted it to the Director of Quality Assurance with Brennan's conclusion that Cephalon was not in compliance.  Brennan has not submitted any evidence that could suggest that anyone with authority told him to change the report.  There is no evidence that he was told by anyone at Cephalon to submit false information to the FDA.

   Brennan's other theory for wrongful termination is that he believed that Cephalon was either not going to take corrective action concerning their noncompliance, or was not going to report the noncompliance to the FDA.  The facts support a different

15

conclusion.  Brennan's Actiq RMP report was distributed internally within Cephalon and a discussion was held regarding what actions were necessary.  The response to the report, originally due December 31, 2003, was moved by agreement, including agreement by Brennan, to January 31, 2004.  Although Brennan alleges the response was delayed, there is no evidence in the record to suggest that Cephalon was not moving forward with actions in response to the Actiq RMP report.  Brennan has not presented evidence that anyone at Cephalon told him that Cephalon did not intend to respond appropriately to the Actiq RMP report.  In fact, when asked in deposition why he was terminated, Brennan testified that he was terminated based on his *own belief* that Cephalon was not taking appropriate action.  An employee's belief that his employer is engaging in illegal conduct is not enough to support a wrongful termination claim.  The Third Circuit in its review of Pennsylvania's at-will doctrine remarked that  "... no federal case has permitted a Pennsylvania at-will employee to recover for wrongful discharge when he merely believes that the act he objected to was illegal." Clark, 9 F.3d at 330.  Rather, it must be clear that the "act would be illegal or infringe upon a fundamental private right." Id. (citations omitted).  Thus, the evidence does not support plaintiff's claim that he was fired for refusing to change his conclusion regarding the Actiq RMP report, or for insisting that Cephalon take corrective action or

16

inform the FDA of its noncompliance.

Alternatively, the evidence does support the claim that the reason Brennan was terminated was his inadequate performance in connection with the Orsymonde audit. Pennsylvania law provides that "even when an important public policy is involved, an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so." Cisco v. United Parcel Services, Inc., 476 A.2d 1340, 1343 (Pa. Super. 1984)(finding employer had legitimate reason for discharging employee who was accused of theft and trespass in the performance of his duties); see DiBerardinis-Mason, 94 F. Supp.2d at 629 (finding employer proffered plausible basis for terminating plaintiff and denied wrongful termination claim). Brennan, along with Sheehan and others, conducted an audit of the Orsymonde facility in November 2003, and concluded, with some exceptions, that the facility was compliant. Cephalon hired an outside consultant to conduct a mock FDA inspection in anticipation of an official FDA inspection. The mock inspection was conducted in late January 2004. The inspection report was presented on or about February 6, 2004, and identified several areas that required corrective action by Cephalon. It also stated that the last audit conducted, in which Brennan participated, was inadequate. Six days after the date of the inspection report Brennan and Sheehan were terminated. Therefore, Cephalon presents a legitimate

reason for terminating Brennan.

## IV.   CONCLUSION

Brennan's wrongful termination claim fails as a matter of law and, therefore, Cephalon's motion for summary judgment is granted.  An Order will be entered consistent with this Opinion.

Dated:    May 8, 2007                s/ Noel L. Hillman
At Camden, New Jersey                NOEL L. HILLMAN, U.S.D.J.